Botsford, J.
INTRODUCTION
The plaintiff Stoneham School Committee (Stone-ham) brings this action for declaratory judgment against the Department of Education (the department), challenging the department’s decision to allocate responsibility for the cost of special education for Luigi DeSisto during the 1991-1992 and 1992-1993 school years to Stoneham. Presently before the court *390 are cross motions for summary judgment, as well as a motion to dismiss under Mass.R.Civ.P. 12(b)(7) which has been filed by the department. For the reasons discussed below, Stoneham’s motion for summary judgment is DENIED, the department’s motion to dismiss is DENIED, and the department’s motion for summary judgment is ALLOWED.
BACKGROUND
Luigi DeSisto (Luigi) was born on September 30, 1971, and at all relevant times here, was a “school age child with special needs,” as defined by G.L.c. 71B, §1.[3] Beginning in July of 1989, shortly before he turned eighteen, Luigi was enrolled in an approved residential education program for autistic children at the New England Center for Autism (NECA) in Southboro, Massachusetts. Luigi’s family lived in Medford, and the Medford school department arranged for Luigi’s placement at NECA. During the 1989-1990 school year, Medford paid for Luigi’s education program at NECA, sharing the cost with the Department of Social Services (DSS), under a “cost share” agreement not included in the record.
In August 1990, when Luigi was approaching the age of nineteen, DSS petitioned the Probate & Family Court, Middlesex Division, to appoint a guardian for Luigi, on the grounds that Luigi was a mentally retarded person who was incapable of making decisions with respect to the conduct of his personal and financial affairs. (The reason(s) that DSS brought the petition are not explained in the record.) The Probate Court appointed Victor Sloan as Luigi’s guardian under G.L.c. 201, §6A. After a few months, Sloan resigned as guardian, when he was informed that the community where he lived, which was not Medford, would become responsible for the cost of Luigi’s special education program, under regulations of the department.[4] On January 8, 1991, the Probate Court appointed Susan Harrison[5] as Luigi’s guardian. The order of appointment stated that she was to be guardian of the person of Luigi and of his estate, and provided she could authorize treatment for him.
During the time that Susan Fothergill served as guardian,[6] her primary activities in that capacity included reviewing and signing (1) orders for antipsy-chotic medication, and (2) documents relating to Luigi’s educational program. Fothergill did not actually have Luigi in her physical custody at any time. She never visited him at NECA and indeed, has never met him. Luigi did, however, continue to be in contact with his parents. He stayed with them at the family home in Medford every other weekend and during vacations from the residential program at NECA,[7] and they remained involved in monitoring and participating in the implementation of his educational plan. Luigi’s parents received reimbursement from Medford for the transportation costs associated with their transporting Luigi between NECA and their home in Medford. See G.L.c. 71B, §8.
Medford continued to assume financial and programmatic responsibility for Luigi’s special educational placement at NECA through the 1990-1991 school year. In May 1991 Susan Fothergill married and moved to Stone-ham. In late October 1991 in connection with their development and review of Luigi’s individual educational plan (IEP) for the 1991-1992 school year, school officials of Medford learned for the first time that Susan Fothergill had moved the preceding May. In early November 1991 Medford notified Stoneham of the move and of its position that Stoneham was therefore financially responsible for Luigi’s placement at NECA beginning July 1, 1991. Medford also contacted the department, requesting it to determine which community had financial responsibility for Luigi’s special education program.
By letter dated March 24, 1992, the department informed Stoneham that under the department’s regulations, Stoneham was deemed financially responsible for Luigi’s special education program since July 1, 1991, due to Fothergill’s move to Stoneham in May of that year. After receiving the letter, Stoneham requested a hearing before the bureau of special education appeals (BSEA) within the department on the issue of Luigi’s residency. The hearing request was denied on May 22, 1992 because, according to the director of the BSEA, the BSEA lacked jurisdiction over the issue.
Counsel for the Stoneham School Committee then asked the department to reverse its decision concerning responsibilfiy for Luigi; the department declined to do so. Stoneham then filed this action in September 1992 seeking a declaration that the department’s assignment of programmatic and financial responsibility for Luigi’s education program to Stoneham was invalid.[8]
The department filed a counterclaim, seeking a preliminary injunction to require Stoneham to pay the costs associated with Luigi’s special education program until the merits of the litigation could be addressed. Stoneham voluntarily agreed to pay the costs at issue, without waiving the claims it advances in this case.
DISCUSSION
At issue here is whether or not Stoneham is responsible for the cost of Luigi’s special education program at NECA from July 1, 1991 until he reached age 22 on September 30, 1993, and was no longer a “school age child” for purposes of the special education laws and regulations.[9] General Laws c. 7 IB, §3 provides that every city, town and school district is obligated to identify children with special needs “residing therein,” and to provide an appropriate special education program for each of them. The key, therefore, is residence. See George H. and Irene L. Walker Home for Children, Inc. v. Franklin, 416 Mass. 291, 295 (1993) (Walker). See also Boston v. Board of Educ., 392 Mass. 788, 792-93 (1984).
The courts have recognized, however, that the statutory phrase “residing therein" in c. 7IB, §3 is not always clear: “The phrase is not so obviously self-defining when considerations such as split families, guardianships, children living with foster parents, *391 relatives or Mends, and institutionalized children enter the picture.” Board of Educ. v. School Comm. of Amesbury, 16 Mass.App.Ct. 508, 512 (1993), quoted in Walker, 416 Mass. at 296. In G.L.c. 71B, §3, the department is granted authority to promulgate regulations “addressed to resolving the issue of residence in situations in which a child’s legal residence may be in some doubt.” Walker, 416 Mass. at 296. The department has done so. See 603 Code Mass. Regs. §28.00,1202.0.
The regulatory provision on which the department relies in this case is 603 Code Mass. Regs. §28.00, 1202.1(c) (paragraph 202.1(c)), which provides as follows:
202.1(c). Children who live in a private residential school, hospital, pediatric nursing home, Department of Mental Health school or Department of Public Health hospital school, Department of Youth Services facility, Department of Corrections or County House of Corrections facility are the responsibility of the school committee which has jurisdiction over the city, town or school district where the child’s father, mother or guardian lives.
The department’s position is that beginning in 1990, when Luigi became the ward of a guardian, by operation of law his guardian rather than his parents assumed both legal and physical custody of him, and therefore, under paragraph 202.1(c), the residence of the guardian defined which school committee would be financially liable for his special education. Accordingly, when Susan Fothergill moved to Stoneham in May 1991 Stoneham, her new town of residence, became responsible for Luigi’s special education program. [10] Stoneham argues that it cannot be responsible because under G.L.c. 71B, §3, the governing factor for determining which school committee pays the cost of a particular child’s special education program is the residence of the child, and it is clear as a factual matter that Luigi has never lived or resided in Stoneham.
Although on the facts of this case the result has aspects that are troubling, the position of the department is supported and indeed seems compelled by G.L.c. 71B, §5(§5). The second paragraph of §5, (as amended through St. 1991, c. 138),[11] provides as follows:
Notwithstanding the provisions of. . . any . . . general or special law to the contrary, if a child with special needs for whom a school committee currently provides or arranges for the provision of special education in a day or residential placement pursuant to the provisions of section three or his parent or guardian, moves to a different school district on or after July first of any fiscal year, said school committee of the former community or residence shall pay the approved budgeted costs, including necessary transportation costs, of such day or residential placement of such child for the balance of such fiscal year. The school committee of the new community of residence shall assume all responsibilities for reviewing the child’s progress, monitoring the effectiveness of the placement, and reevaluating the child’s needs from the date of new residence; provided, however, that during the period when the financial obligation of the former community of residence for such day or residential placement continues pursuant to this section, the school committee of such new community residence shall provide the school committee of the former community residence with notice of any such review, monitoring, and reevaluation, and an opportunity to participate; and provided, further, that the school committee of such new community of residence shall be financially responsible for any increase, and the obligation of the school committee of such former community residence shall be reduced by any decrease, in the costs of such day or residential placement during such period which results from any such review, monitoring or reevaluation.
(Emphasis supplied.) Under the terms of this section, then, where a child in need of special education is placed in a residential program, the community making the placement is responsible for the cost of that placement, and remains so while the child, his parent(s) or guardian “reside” in that community. When the child, his parent or guardian move to a different school district, the new district becomes responsible for the provision of special education for the child, but the “old” school district remains financially liable for the residential placement costs through to the end of the fiscal year in which the move occurred. Obviously implicit in this scheme is that the “new” school district to which the child, his parent(s) or guardian has moved will become financially responsible for the child’s special education costs beginning in the fiscal year after the move. See 603 Code Mass. Regs. §28.00, ¶332.3.[12]
I interpret the disjunctive references to the child or his parent or guardian in §5 not as offering three equally available choices for designating the school district that will assume financial responsibility for the child in a residential or day education program. Rather, the three terms appear to be intended to define the residence of a “school age child” in three different situations, namely, (1) where the “child” has actually reached the age of majority, is not under guardianship and has his own residence independent of his parents, compare Walker, 416 Mass. at 295 (“[t]he domicil, or residence, of a minor child generally is the same as the domicil of the parent who has physical custody of the child”), and cases cited; (2) where the “child” is still a minor and presumably “resides” where his custodial parent or parents reside, see Walker, 416 Mass. at 295-97 (minor children in residential special education programs reside in the town where their mother, who was awarded physical custody of the children in the parents’ divorce, resides); and (3) where the “child,” whether or not still a minor, is the ward of a guardian with physical custody of the “child.” Furthermore, these three categories or situations seem to be *392 mutually exclusive. In Walker, the court construed G.L.c. 7 IB, §3 as following the common law rule that a person can only have one domicil or residence at one time. Walker, 416 Mass. at 295. See Dane v. Registrars of Voters of Concord, 374 Mass. 152, 161 (1978). The same interpretation should be given to §5, particularly as the result accords with common sense: insofar as legal residence is at issue, a child cannot be simultaneously living independently, under the care and custody of a parent, and under the care and custody of a guardian.[13]
On the face of it, §5, second paragraph appears to apply to Luigi’s situation. Beginning in 1989, he was enrolled and participating in a residential education program in accordance with a special education plan proposed and implemented by Medford. Beginning in January 1991, when Luigi was still enrolled at NECA, he became the ward of Fothergill. Fothergill had lived in Medford from the date of her appointment until May 1991, when she moved to Stoneham. The date other move was obviously after July 1, 1990, the beginning date of the 1991 fiscal year. Thus, Medford remained responsible for Luigi’s special education costs up through June 30, 1991, the end of the 1991 fiscal year, but §5 would seem to require Stoneham to assume financial responsibility for Luigi’s special education program after that date. The regulation on which the department relies, although not specifically implementing these provisions of §5,[14] are wholly consistent with them.
Stoneham argues that such a result flies in the face of the residence focus of G.L.c. 7 IB, §3, since Luigi has never lived in Stoneham or even visited his guardian there. It is true that Luigi himself was never a physical resident of Stoneham, but §5 is a statute dealing with a very specific subset of all special needs children covered by §3 — those in a special education residential or day program — and it treats the issue of residence in a particular way for these children. The provisions of §§3 and 5 are not unharmonious. The specific provisions of §5 concerning residence may and should be given effect in conjunction with the more general terms of §3. See Charles C. v. Commonwealth, 415 Mass. 58, 64 (1993).
During the years at issue, there is no question that Fothergill was the appointed guardian for Luigi pursuant to G.L.c. 201, §6A(a).[15] Both by the terms ofher appointment and under G.L.c. 201, §§6A(a) and 12,[16] Fothergill as guardian legally had physical custody (“custody of the person”) of Luigi. It is plainly a matter of concern that in this case Fothergill, holding that legal status and the right to determine Luigi’s domicil, should in fact have no contact with her ward, because it permits a situation where a town with no direct connection to a “school age child” ends up being responsible to pay the cost of the child’s residential program.[17] But as indicated above, the Legislature in §5, paragraph 2 appears to have prescribed that a guardian with custody, like a parent with custody, will define the child’s residence.[18]
In sum, I conclude that §5, paragraph 2 supports and indeed dictates the result reached by the department in this case, viz., that Stoneham be assigned financial and programmatic responsibiliiy for Luigi’s special education program as of July 1,1991. As indicated, in several ways, it is a result that goes against the grain: Luigi has never lived in Stoneham, but has always had ties to Medford, and Stoneham had the obligation imposed on it after-the-fact. But if the result seems unfair, resort to the Legislature appears necessary.[19]
Two final points require discussion. The first is the department’s motion to dismiss. The department argues the case must be dismissed under Mass.RCiv.P. 19 because Stoneham did not join a necessary party, namely, Medford. The motion was previously denied on grounds that it was untimely and further that on the merits, Medford was not necessary to the litigation of Stoneham’s claim. There is no reason to revisit the correctness of the ruling, particularly in light of the result I reach in the case.
The second point is Stoneham’s argument that the case should be remanded to the department for a hearing before the BSEA. Again, given the result I reach on Stoneham’s responsibility for the special education costs at issue, a hearing by the BSEA is not necessary. I do agree with Stoneham, however, that the BSEA certainly appears to have had jurisdiction to consider the issue Stoneham tried to bring before it. The BSEA’s role is defined to include the resolution of disputes concerning “the identification, evaluation, placement ... or the provision of a free appropriate public education to special needs children . . .” 603 Code Mass. Regs. §28.400.0, and a school committee as well as a parent may request a hearing before the BSEA “on any matter concerning the identification, evaluation, placement, proposed IEP, . . . manner of implementation of an accepted IEP, provision of a free appropriate public education, or procedural protections of state and federal law . . .” Id., §28.402.0. This language is broad enough to encompass a school committee’s challenge to its obligation of providing a free, appropriate special education program to a particular child. See Stock v. Massachusetts Hosp. School, 392 Mass. 205, 214 n.15 (1984) (remanding case to the department to hold administrative hearing to resolve which district should bear responsibility for special education costs of particular child).
ORDER
For the foregoing reasons, it is ORDERED that the motion for summary judgment of the Stoneham School Committee be denied, the motion to dismiss of the Department of Education be denied, and the motion for summary judgment of the Department of Education be allowed. A final judgment is to enter in this case declaring that pursuant to G.L.c. 7 IB, §5, the Stoneham School Committee is responsible for paying the costs of the residential program for Luigi DeSisto during the 1991-1992 and 1992-1993 school years.

General Laws c. 71B, §1 defines a “school age child" as a person from age three through twenty-one who has not obtained a high school diploma or its equivalent. Section 1 defines a “school age child with special needs” in part as:
a school age child, who because of a disability consisting of a development delay or an intellectual, sensory, neurological, emotional, communication, physical, specific learning or health impairment or combination thereof, is unable to progress effectively in regular education and requires special educational services in order to successfully develop the child’s individual educational potential

See 603 Code Mass. Regs. §28.00, ¶2.01(c), quoted in the text below at p.7.

Susan Harrison married in the spring of 1991 and changed her name to Susan Fothergill. She is referred to as Susan Fothergill or Fothergill in this memorandum.

Susan Harrison moved to resign as guardian for Luigi in June 1992. The motion was allowed pending the appointment of a successor guardian. While a motion to appoint a substitute permanent guardian was filed by DSS in July 1992, the record does not indicate what action was taken on the motion.

During Luigi’s enrollment at NECA, he stayed with his parents in Medford for approximately 84 days a year, and remained at NECA for the remainder of the time.

Stoneham’s complaint asks the court to determine a number of other issues beyond the validity of the assignment of financial responsibility, including (1) that the department did not have the authority to make the assignment decision; (2) that Fothergill is not a guardian for purposes of the department’s regulations; (3) that the assignment of costs to Stoneham was invalid because Medford breached its legal duty to warn Stoneham of Fothergill’s move; (4) that the department may not assign payment responsibility retroactively; (5) that the department improperly denied its request for a hearing; and (6) that the BSEA also improperly denied the hearing request. Stoneham does not appear to pursue all of its requested declarations in this summary judgment motion, and to the extent that they are not discussed, they are deemed waived.

There is no dispute between the parties that under G.L.c. 7 IB, §§3 and 5, Medford was required to pay for Luigi’s special education program at NECAfrom its inception in 1989 at least until July 1, 1991.

As indicated above (see note 8), the department acknowledges that Stoneham’s financial responsibility for Luigi did not begin on the date that Fothergill moved, May 1991. Rather, in the department’s view the responsibility came into play on July 1, 1991. This delay beyond the moving date is mandated by G.L.c. 71B, §5, and the department’s regulations, 603 Code Mass. Regs. §28.332.3, discussed in the text below.

This was the version of G.L.c. 7 IB, §5 in effect on July 1, 1991, the date the department claims Stoneham became financially liable for Luigi. Section 5 was amended in 1992, but the amendment has no bearing on this case.

Paragraph 332.3 of 603 Code Mass. Regs. §28.00 provides explicitly that the school committee of the new community is to assume financial responsibility for the cost of the child’s special education program as of the date of the move to the new residence, except that (in accordance with G.L.c. 7 IB, §5, para. 2) during the remainder of the fiscal year in which the move occurs, the old community of residence will continue to be financially responsible for the program.

With respect to the third category of residence treated in §5, that of a ward, at common law, a guardian of a mentally incompetent adult had the same power to “appoint the place of residence” of the ward as a parent had over his or her minor child. See Holyoke v. Haskins, 22 Mass. (5 Pick.) 20, 26 (1827). Section 5, paragraph 2 similarly appears to treat the relationship between a minor child and his parent(s) on the one hand and that between award and guardian on the other as equivalent insofar as determination of a “school age child’s” residence is concerned — that is, the child’s residence is defined by that of the parent or guardian.

The specific regulation implementing §5, para. 2 is 603 Code Mass. Regs. §28.332.

General Laws c. 201, §6A(a) provides in relevant part:
A parent of a mentally retarded person ... or any agency within the executive offices of human services or educational affairs may file a petition in the probate court asking to have a guardian appointed for such mentally retarded person. If, after notice . . . and a hearing, the court finds that the person is mentally retarded to the degree that he is incapable of making informed decisions with respect to the conduct of his personal and financial affairs, that failure to appoint a guardian would create an unreasonable risk to his health, welfare and property, and that appointment of a conservator pursuant to section sixteen B would not eliminate such risk, it may appoint a guardian of his person and estate . . .

General Laws c. 201, §12 provides in part that “(t]he guardian of a mentally ill or mentally retarded person . . . shall have the care and custody of the person of his ward . . . and the management of his estate . . .”

On the other hand, it bears noting that, where, as here, the child is enrolled in virtually a full-time residential program, this result could also happen even if the child remains in legal custody of his parents. A hypothetical illustrates the point. Assume that Luigi were enrolled full-time in a residential program such as NECA, but that he was still a minor child within the custody of his parents. If, while Luigi remained a student at NECA, his parents were to move to a different city or town — one that Luigi had never himself lived in — under §5, para. 2, the new community would nevertheless become programmatically responsible for Luigi’s special education program as of the date of the move and financially responsible at the beginning of the next fiscal year. This is a result that would appear, I believe, both appropriate and expected to most observers.

Perhaps the more troubling aspect about applying the provisions of §5, para. 2 to this case, however, is that the statute seems implicitly to assume that when a school age child who is enrolled in a residential program (or parent or guardian of such a school age child) moves, the school department of the new community of residence will be made aware of that fact at the time of the move; otherwise, the statutory provisions which address the obligation of the new community to review and monitor the child’s educational placement as of the date of the move, and the right of the old community to participate in that evaluation process, seem hollow. In fact, however, Stoneham had no knowledge of Luigi until November 1991, four months after the start of the fiscal year following Fothergill’s move, and six months after the move itself. Stoneham thus had no way to plan the assumption of financial responsibility for Luigi during the 1992 fiscal year. Nevertheless, an effort to read a notice requirement into the statute runs into difficully because it is not clear who should be responsible for giving notice. For example, in this case, the record suggests that Fothergill moved from Medford to Stoneham without notifying anyone in either school department or anyone at NECA. In the circumstances, imposing *394 an obligation on Medford to notify Stoneham of Fothergill’s move in a timely manner might create an impossible standard to meet. Moreover, as the provisions in §5, para. 2 requiring the new community of residence to notify the old about any IEP review indicate, when the legislature wished to impose a notice obligation, it knew how to do so. For both these reasons, it seems more appropriate to read the statute as written, and not to graft on to §5 a requirement that before a new community of residence may be held financially responsible for a residential placement of a child, it must receive timely notice that the child, his parent or guardian had moved into the community. Cf. Negron v. Gordon, 373 Mass. 199, 202, (1977).

It would also help significantly if the DSS were to communicate with the relevant school departments when it moves to appoint a guardian for a “school age child” requiring special education services.